# Exhibit A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPERIOR COURT
                                               CIVIL ACTION NO.:

_____
                                  )
   STEPHEN DEFUSCO,               )
                                  )
                                  )
         Plaintiff,               )
   v.                             )
                                  )
   ZUORA, INC.,                   )
                                  )
         Defendant.               )
_____  )

## COMPLAINT AND JURY DEMAND

1.      Plaintiff Stephen DeFusco, by and through his undersigned counsel, hereby files

this Complaint against his former employer, Defendant Zuora, Inc. ("Zuora"), for, *inter alia*, its

violation of the Massachusetts Wage Act (G.L. c. 149, s. 148 *et al.*) and states as follows:

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff Stephen DeFusco is an individual residing in Marshfield, Massachusetts.

3.      Defendant Zuora is a foreign corporation organized under the laws of Delaware

and having a principal office at 101 Redwood Shores Pkwy., Redwood City, CA 94065, and

offices located at 100 High Street in Boston.

4.      Jurisdiction is proper in this Court pursuant to G.L. c. 212, § 4.

5.      Venue is proper in this Court pursuant to G.L. c. 223, § 8(4), as the defendant has

a usual place of business in this county.

## FACTS

6.      Zuora is an enterprise software company that creates and provides software for

businesses to launch and manage their subscription-based services.  Zuora's applications are

1

designed to automate recurring billing, collections, quoting, revenue recognition, and subscription metrics.

7.      Mr. DeFusco is an experienced marketing and technology sales manager specializing in the information technology and services industry.

8.      From August 2018 until February 2020, Mr. DeFusco was employed by Zuora in its Boston location as a Field Account Executive.

9.      In that role, Mr. DeFusco was responsible for acquiring and developing "net new" business opportunities (*i.e.*, new clients), as well as selling additional solutions to existing clients.

10.     Effective August 1, 2018, Zuora issued the Global Subscription ACV Split Policy (the "Policy"), which provides that "[a]ll opportunities closed after the effective date are subject to the terms and conditions of this Policy."  Policy, ¶ 1.1.  A true and accurate copy of the Policy is attached hereto as Exhibit A.

11.     According to the terms of the Policy, "Compensation to individuals or organizations will be based on communicated and documented evidence of the significant effort and investment of resources in support of the customer opportunity."  *Id.*, ¶ 2.3 ("Compensation for Effort").

12.     The Policy provides various scenarios for allocating split percentages for Annual Contract Value ("ACV"), which is used to calculate employees' (including Mr. DeFusco's) commissions.

13.     Paragraph 4.1 of the Policy specifies that a "[g]lobally led deal including HQ contract without local support" yields a 100 percent allocation to the Zuora Global Account Owner.

14.     Starting in around August 2018, Mr. DeFusco was assigned to manage Zuora's client, the American Institute of Certified Public Accountants ("AICPA").  This assignment was made by Zuora's operation team and by Jon Steinberg, vice president at Zuora.

15.     According to Zuora's customer relations management (CRM) software, Mr. DeFusco was the exclusive account owner of AICPA.

16.     Mr. DeFusco immediately started working on the AICPA account following the assignment.

17.     On October 15, 2018, AICPA's Senior Enterprise Architect, Narashimha Nethi, reached out to Mr. Steinberg to re-engage Zuora for an integration project (the "Project").

18.     On October 31, 2018, discussions about the Project started in earnest, with a kick-off among AICPA, its change management expert (EY), and AICPA's systems integrator (Accenture).  On this date, the parties entered into a mutual nondisclosure agreement and established a test environment.

19.     Thereafter, Mr. DeFusco continued working with AICPA.  He had extensive interactions with AICPA and its agents (EY and Accenture) through November 2018.

20.     On December 4, 2018, Mr. DeFusco was introduced to Scott Spiegel, the Chief Financial Officer of AICPA.  During his phone call with Mr. Spiegel, Mr. DeFusco discussed the planned engagement with AICPA, addressing AICPA's main business goals, AICPA's challenges, as well as a projected timeline for completion of the Project.  Messrs. Spiegel and DeFusco also discussed the importance of ensuring that AICPA's goals were aligned with Zuora's product.

21.     On December 10, 2018, Mr. DeFusco and others spoke with Mr. Spiegel on the phone to conduct a pricing overview for the Project.

22.     Following his interactions with Mr. Spiegel, Mr. DeFusco continued to work on the engagement with others on his U.S. team to create a test environment, which was established and presented to AICPA's board.

23.     According to a February 14, 2019 email from Michael Turner of EY, AICPA's leadership team was fully supportive of the concepts that had been demonstrated to them by Mr. DeFusco and his team, adding that "[t]here was also agreement that we should start planning with the aim of an MVP release in 2019, focused on the US market.  I would hope that Zuora could be part of that MVP release, so we now need to shift towards a more serious discussion on implementation considerations, such as scope of the release, leverage of the Zuora tools, licensing implications, etc."

24.     On February 19, 2019, the parties established a joint execution plan and agreed upon a process that would be necessary to finalize the closing of the Project, including the sharing of additional data and execution of a new mutual nondisclosure agreement between Zuora and AICPA.

25.     On April 7, 2019, AICPA's CFO Mr. Spiegel informed Mr. DeFusco that Accenture would be managing the procurement for all the vendors assisting AICPA for its integration project.

26.     On April 7, 2019, there was a kick-off conference call with Accenture and Zuora's U.S. team.

27.     On April 11, 2019, management informed Mr. DeFusco that there was to be a teaming between Zuora's U.S. and U.K. groups.  One of Mr. DeFusco's colleagues in the U.K., Grant Marshall, asserted that he would be the "point of contact" between Accenture and Zuora.

28.     On May 24, 2019, Mr. DeFusco was told that his U.S. team needed to stand

down.  From this point forward, Mr. DeFusco and the U.S. team were completely isolated from AICPA by Zuora operations, and no communications with AICPA made by Zuora's U.K. team were shared with Zuora's U.S. team.

29.     The deal for the Project closed on August 31, 2019.

30.     Mr. DeFusco's significant effort and investment of resources in support of the customer opportunity was communicated to Zuora and supported by documented evidence.

31.     Notwithstanding Mr. DeFusco's primary role in winning the Project for Zuora, serving as the Global Account Owner for and managing the AICPA account and the Project, he was informed that he would not be paid his complete commission.  Specifically, on October 29, 2019, Mr. DeFusco was informed that Zuora would pay him a commission based on a 25 percent split.

32.     On October 30, 2019, Mr. DeFusco asked Zuora to explain its rationale for granting him only a 25 percent credit on the AICPA Project, instead of the 100 percent credit he was entitled to.  In a November 4, 2019, response, Zuora explained that the split was based on the rationale that the U.S. team had "originated the initial proposed deal and submitted pricing for the initial deal" but that the "EMEA team worked on the deal that eventually closed after the deal was moved from AIPCA [sic] to Accenture UK, which resulted in a different deal with different pricing being proposed and eventually accepted by the customer."  Zuora's response continued:

> Based on these facts, [Zuora's] Sales Ops determined that the US team should get a 75/25 split on the original deal that was proposed and priced by the US team . . . and that the EMEA team should be provided the remainder.  Sales Ops then calculated what was actually sold against the original US pricing proposal (which equals 23.6% of the total deal that was eventually sold) and then rounded that amount up so that the US team received a 25/75 split on the deal that the EMEA team actually closed.

33.     The 25 percent split – and the rationale behind it – does not appear in any of the

split scenarios provided in the Policy.  In addition, on information and belief, the deal was moved to Zuora's U.K. team because of, *inter alia*, that team's preexisting relationship with AICPA's systems integrator, Accenture.

34.     Zuora's rationale for crediting a connection between AICPA and the U.K. team is without merit for several reasons, including:

    a.   The Project did not require any U.K. Support;

    b.   AICPA is headquartered in the United States;

    c.   21 of 22 AICPA employees who were involved in the transaction are based in the United States;

    d.   None of the first-year revenue from the Project will be derived from AICPA's UK entity (Chartered Institute of Management Accountants, or "CIMA");

    e.   Eighty percent of the overall revenue for the Project will be derived from the AICPA-side of the entity (the remainder will be derived from CIMA);

    f.   The deal was signed in the U.S. by AICPA's U.S. representative;

    g.   The Project is hosted and managed in the U.S.; and

    h.   All services provided to AICPA by Zuora's U.K. team are services that Mr. DeFusco and the U.S. team were capable of, but precluded from, providing.

35.     In short, the Project is a U.S.-based deal for which Mr. DeFusco was the Global Account Owner and required no local support.  Accordingly, based on Zuora's Policy, Mr. DeFusco was owed a 100 percent commission split on the Project, which became definitely determined and due and payable approximately one month after Zuora's receipt of a fully-

executed order for services dated August 31, 2019, from AICPA.

36.     Specifically, Mr. DeFusco's Compensation Plans for Fiscal Years 2019 and 2020 provide that commissions are "generally calculated by multiplying the applicable Commission Rate by the amount of Quota Credit attributable to a particular Subscription Fee Transaction." Pursuant to this formula, Mr. DeFusco's commissions were also definitely determined.  His 2019 commissions attainment outside of the AICPA transaction totaled approximately $312,582, and the 2019 Quota Credit attributable to the AICPA transaction was approximately $1,478,130.  Mr. DeFusco was also owed a $25,000 so-called "ramp bonus" (which is awarded "[f]or opportunities closed with increasing values in years beyond the initial term," according to the Compensation Plans).  Multiplying Mr. DeFusco's Quota Credit attributable to the AICPA transaction, in addition to his other commissions attainment, by the applicable Commission Rates, and adding the $25,000 ramp bonus, Mr. DeFusco was owed approximately $271,228.10 in commissions in 2019.

37.     These commissions are also due and payable to Mr. DeFusco.  His Compensation Plans for Fiscal Years 2019 and 2020 provide that "Commissions for Subscription Fee Transactions with Standard Payment Terms … [like the AICPA transaction] are eligible to be 100% paid to the Employee based on bookings."  Zuora "booked" the AICPA transaction in August 2019.  Accordingly, at least as of August 2019, Mr. DeFusco's commission for the Project was earned.  His personal compensation plan provides for payment 31 days after the end of that fiscal month.  Accordingly, the commissions were due and payable in or before November 2019.

38.     However, instead of paying Mr. DeFusco the $271,228.10 in definitely determined and due and payable commissions, and an additional $32,210.42 for "remaining

ramp" related to the Project before his departure in February 2020, Zuora paid Mr. DeFusco only

$66,000, consistent with the 25 percent split Zuora provided (instead of the 100 percent split,

which was warranted in these circumstances), and $25,000 for meeting his ramp for annual

attainment, in his November 2019 paycheck.

39.     Through counsel, Mr. DeFusco made a demand to Zuora for the full 100 percent

commission split by letter on November 7, 2019.

40.     To date, Zuora has failed to pay Mr. DeFusco his commissions due.

41.     In a letter dated January 10, 2020 The Commonwealth of Massachusetts Office of

the Attorney General authorized Mr. DeFusco to pursue his wage claim through a private civil

lawsuit.  A true and accurate copy of this letter is attached hereto as Exhibit B.

## COUNT I

### VIOLATION OF G.L. C. 149, §§ 148 & 150

42.     Mr. DeFusco repeats and realleges the foregoing paragraphs as though they were

fully set forth herein.

43.     Mr. DeFusco was an employee of Zuora within the meaning of M.G.L. c. 149,

§§ 148 & 150.

44.     Mr. DeFusco's compensation as an employee of Zuora included commissions that

were definitely determined and due and payable under the Policy and the Compensation Plans

for Fiscal Years 2019 and 2020.  These commissions constitute wages under M.G.L. c. 149, §§

148 & 150.

45.     Zuora has failed to pay Mr. DeFusco wages, including commissions, for his work

at Zuora.

46.     The failure of Zuora to pay Mr. DeFusco his wages constitutes a violation of the

Massachusetts Wage Act, G.L. c. 149, §§ 148 & 150.

47.     As a result of Zuora's conduct, Mr. DeFusco has been damaged and continues to be damaged in an amount to be determined at trial, with applicable damages to be trebled, plus an award of litigation costs and attorneys' fees incurred by Mr. DeFusco in prosecuting his claim.

## COUNT II

### QUANTUM MERUIT

48.     Mr. DeFusco repeats and realleges the foregoing paragraphs as though they were fully set forth herein.

49.     Mr. DeFusco provided to Zuora services, including originating, negotiating, and launching the Project with AICPA, thereby conferring a substantial and measurable benefit upon Zuora.

50.     Based on the language of the Policy, Mr. DeFusco reasonably expected to be compensated commissions based on a 100 percent ACV "split" for the Project with AICPA.

51.     Zuora knowingly accepted Mr. DeFusco's services, and the benefits that flowed therefrom, with the knowledge of Mr. DeFusco's reasonable expectation (based on, *inter alia*, the Policy) to be paid commissions based on a 100 percent "split" for the Project with AICPA.

52.     Despite demand, Zuora has not paid Mr. DeFusco all of the commissions he is due.

53.     As a result of Zuora's conduct, Mr. DeFusco has been damaged and continues to be damaged in an amount to be determined at trial.

## COUNT III

### UNJUST ENRICHMENT

54.     Mr. DeFusco repeats and realleges the foregoing paragraphs as though they were fully set forth herein.

55.     Mr. DeFusco provided to Zuora services, including by originating, negotiating, and launching the Project with AICPA, thereby conferring a substantial and measurable benefit upon Zuora.

56.     Zuora knowingly accepted Mr. DeFusco's services, and the benefits that flowed therefrom, knowing that such benefits were a direct result of Mr. DeFusco's efforts, to Mr. DeFusco's unjust detriment.

57.     Under the circumstances described herein, Zuora's acceptance and retention of the benefits conferred upon it by Mr. DeFusco was (and continues to be) inequitable.

## COUNT IV

### BREACH OF CONTRACT

58.     Mr. DeFusco repeats and realleges the foregoing paragraphs as though they were fully set forth herein.

59.     Mr. DeFusco and Zuora are parties to the Policy and the Compensation Plans for Fiscal Years 2019 and 2020, which are valid and binding contracts.

60.     The Policy and the Compensation Plans for Fiscal Years 2019 and 2020 were at all times supported by valid consideration, as, *inter alia*, Mr. DeFusco provided services to Zuora in exchange for certain compensation (and compensation structures) set forth in the Policy and the Compensation Plans for Fiscal Years 2019 and 2020.

61.     Pursuant to Sections 2.3 and 4.1 of the Policy, Zuora was obligated to compensate

Mr. DeFusco based on his "significant effort and investment of resources" in support of the Project opportunity with AICPA which, in this instance, included a 100 percent ACV allocation to Mr. Zuora as the Global Account Owner of AICPA.

62.     Pursuant to the Compensation Plans for Fiscal Years 2019 and 2020, Zuora was obligated to compensate Mr. DeFusco "Commissions for all qualifying Subscription Fee Transactions. . . .," which, in this instance, includes all commissions due for the AICPA transaction – only a fraction of which was actually paid to Mr. DeFusco.

63.     At all times, Mr. DeFusco performed his obligations under the Policy and the Compensation Plans for Fiscal Years 2019 and 2020, in particular with respect to AICPA and the Project.

64.     Despite Mr. DeFusco's satisfaction of his obligations under the Policy and the Compensation Plans for Fiscal Years 2019 and 2020, Zuora has, without justification, failed to pay Mr. DeFusco all of the compensation owed to him under the Policy and the Compensation Plans for Fiscal Years 2019 and 2020.

65.     Zuora's conduct in this regard constitutes a breach of the parties' agreements, the Policy and the Compensation Plans for Fiscal Years 2019 and 2020.

66.     As a result of Zuora's conduct, Mr. DeFusco has been damaged and continues to be damaged in an amount to be determined at trial.

### COUNT V

BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

67.     Mr. DeFusco repeats and realleges the foregoing paragraphs as though they were fully set forth herein.

68.     The Policy and the Compensation Plans for Fiscal Years 2019 and 2020 each

contain an implied covenant of good faith and fair dealing.

69.     Mr. DeFusco satisfied all of his obligations under the Policy and the Compensation Plans for Fiscal Years 2019 and 2020.

70.     Starting in May 2019, Zuora shifted the Project to its U.K. team, and isolated Mr. DeFusco's team from AICPA, in bad faith and without good cause, thereby depriving Mr. DeFusco of compensation for his services due under the Policy and the Compensation Plans for Fiscal Years 2019 and 2020.

71.     As a result of Zuora's conduct, Mr. DeFusco has been damaged and continues to be damaged in an amount to be determined at trial.

## COUNT VI

### DETRIMENTAL RELIANCE

72.     Mr. DeFusco repeats and realleges the foregoing paragraphs as though they were fully set forth herein.

73.     Zuora represented to Mr. DeFusco through the Policy that, as Global Account Owner of the AICPA account requiring no local support, he would be paid commissions based on a 100 percent ACV split.  Zuora also represented that compensation would be "based on communicated and documented evidence of the significant effort and investment of resources in support of the customer opportunity."

74.     Zuora should have reasonably expected that its promises in this regard would induce Mr. DeFusco to invest significant effort and investment of resources in support of the Project as the Global Account Owner for AICPA.

75.     Zuora's promises in the Policy did, in fact, induce Mr. DeFusco to invest significant effort and investment of resources in support of the Project with AICPA, and to

perform all other responsibilities as Global Account Owner for the client.

76.    Despite its representations, and to Mr. DeFusco's detriment, Zuora has failed to pay Mr. DeFusco all the money he was due for the work that he performed in 2018 and 2019. Injustice can only be avoided by enforcing the promises made in the Policy and awarding Mr. DeFusco compensation based on a 100 percent ACV split.

77.    As a result of Zuora's conduct, Mr. DeFusco has been damaged and continues to be damaged in an amount to be determined at trial.

## COUNT VII

### ACCOUNTING

78.    Mr. DeFusco repeats and realleges the foregoing paragraphs as though they were fully set forth herein.

79.    Mr. DeFusco is entitled to an accurate accounting of the following:

a.    Calculation of all revenues, costs and expenses incurred by Zuora related to the Project with AICPA; and

b.    Calculation of all commissions, overrides, bonuses, and other compensation paid out to any and all past and current Zuora employees (including to Mr. DeFusco) related to the Project with AICPA.

## REQUESTS FOR RELIEF

WHEREFORE, Mr. DeFusco respectfully requests that this Court grant the following relief:

A.    Enter judgment for Mr. DeFusco on each Count of the Complaint;

B.    Find in favor of Mr. DeFusco on Count I, award him damages in an amount to be proven at trial with all damages to be trebled pursuant to G.L. c. 140, § 150, and also award him his attorneys' fees;

13

C.      Find in favor of Mr. DeFusco on Counts II through VI of the Complaint and award him damages in an amount to be proven at trial;

D.      With respect to Count VII, enter an order requiring Zuora to provide a complete accounting as specified therein; and

E.      Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

Mr. DeFusco hereby demands a jury trial as to all claims so triable.

Respectfully submitted,

STEPHEN DEFUSCO,

By his attorneys,

Stephen D. Riden, BBO No. 644451
    *sriden@beckreed.com*
Hannah Joseph, BBO No. 688132
    *hjoseph@beckreed.com*
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, Massachusetts 02110
(617) 500-8660
Facsimile: (617) 500-8665

Dated: November 15, 2020

# Exhibit A

# Zuora, Inc.

## Global Subscription ACV Split Policy

Effective: August 1, 2018

### 1. PREFACE

*The Split compensation credit and quota retirement will never exceed 100% of the deal value therefore it is important to understand the following rules which are a transparent and consistent allocation of ACV to each franchise participating in the transaction.*

**1.1.** This Policy is effective as of August 1, 2018. All opportunities closed after the effective date are subject to the terms and conditions of this Policy.

**1.2.** Opportunities closed prior to August 1, 2018 are subject to the agreed-upon split terms for those specific transactions.

**1.3.** All Zuora Account Executives and Management are expected to act according to this Policy. Failure to comply will result in disciplinary action and penalties.

**1.4.** Subject to this Policy are all transactions that earn ACV credit and quota retirement, including New Business transactions, upsells, cross-sells, and renewal-saves.

**1.5.** Violations of the Policy (permission to engage, hijacking an existing opportunity, pricing violation and escalation obstruction) may carry quota achievement penalties to enforce Policy compliance.

### 2. GUIDING PRINCIPLES

*The following principles will be the primary decision making framework when applying the Global Split Policy:*

**2.1 Customer First:** Meeting the needs and goals of Zuora's customers should always take priority over personal and organizational desires to receive credit and compensation for an opportunity.

**2.2 Cooperation:** Franchises must work together to maximize ACV for Zuora overall, and not put one franchise's goals ahead of those of the Company as a whole. Teams are expected to execute this principle both geographically and across local franchises.

**2.3 Compensation for Effort:** Compensation to individuals or organizations will be based on communicated and documented evidence of the significant effort and investment of resources in support of the customer opportunity. Once the split ACV has been determined, a fair split will be assessed using the rules and escalation process contained in this Policy.

**2.4 Transparency:** Interactions between individuals and organizations must be open, obvious, and well documented. All activities with the customer must be disclosed.

**2.5 Use of Cross-Functional resources:** If a franchise wishes to utilize the cross-functional resources (e.g. Sales Engineers, Global Services, Alliances) of another franchise, they must obtain pre-approval from the cross-functional resource leader and notify the impacted franchise leader.

**2.6 Meetings with the Customer/Prospect:** Any meetings with Customers or Prospects that occur outside of the Sales Team's region shall be communicated to the local franchise leader prior to the meeting taking place.

**2.7 Split Promises are Inviolable:** A commitment on a dually agreed-upon split must be honored, and cannot be reversed regardless of account team changes.

**2.8 Ethical Code of Conduct:** Individuals involved in the Split are expected to conduct themselves with the utmost professionalism and adhere to the rules of engagement.

**2.9 Identification of the Company's headquarters:** For purposes of identifying the prospect/company's headquarters, in order to determine who is the Global Account Owner (GAO), the following decision workflow shall be followed:
1. The Company has specified the location of their headquarters on their website
2. The location of the company's Chief Executive Officer
3. The location of the company, as stipulated in LinkedIn.com
4. The location of key decision makers (e.g. CFO, procurement), including location of where the contract will be signed.

## 3. ALIGNMENT PROCESS

*Compliance with the described processes safeguards compensation for sales efforts.*

**3.1** To avoid parallel sales cycles the Zuora Local Account Owner (LAO) will contact the Zuora Global Account Owner (GAO) immediately after a local incremental opportunity/functionality is identified by requesting permission to engage with the affiliate/company of a Global Account highlighting the potential local opportunity. No local sales cycle activity or deal execution can take place prior to the Go/No-Go decision. The GAO must respond within 5 business days with either approval or denial. After 5 days the LAO may contact the Franchise Leader of the GAO for decision.

**3.2** An engagement denial from the GAO must include mandatory background information for the LAO:
· Products/functionality already licensed
· Current HQ sales cycles **and related opportunity numbers** (i.e. there MUST be an active opportunity in salesforce.com being run by the GAO to evidence an existing sales cycle).

**3.3** It is the duty of both franchises involved in the split to immediately create opportunities in salesforce.com once the Split is agreed-upon if there is not an opportunity already in place. The opportunities must be created under the parent account and the subsidiary account for the relevant customer/prospect.

## 4. SPLIT SCENARIOS

*Split percentages are not up for negotiation between the Sales teams but derived from one of the following scenarios:*

**4.1 Globally led deal including HQ contract** without local support: **100% GAO and 0% LAO**

**4.2 Collaborative sales cycle** regardless where contract signs**: 50% GAO and 50% LAO** on basis of local demand for sales and pre-sales resources to perform sales efforts, such as engagement with key decision makers, the need for product demos and scoping for locally-performed implementation services.

**4.3 Locally led deal but HQ signed: 20% GAO and 80% LAO** A GAO cannot enforce § 4.2 unless the LAO requests for GAO support or HQ sales cycle activities can be proven.

**4.4 Locally led deal including local contract: 0% GAO and 100% LAO** In this scenario § 3.1 is modified to: LAO to create local opportunity with basic functional scope and notifies the GAO with opportunity number. If the GAO does not respond with a denial within 5 working days, permission is assumed. (GAO denials must comply with § 3.2). No split agreement necessary. GAO must deliver pricing/conditions based on § 6.3.

**4.5** Split agreements must be documented via e-mail, with all impacted parties (Account Executives and Franchise leaders) included on the e-mail.

**4.6** GAOs must not steal local opportunities and sell them in the HQ without providing compensation to the LAO. The LAO may claim up to 80% (including penalty) of the HQ ACV (based on local demand) if all of the following can be proven:
· LAO can provide proof of request for permission to engage which was either denied without sufficient proof or not responded to for the same product/functionality within the last 12 months
· GAO cannot provide an equivalent opportunity created prior to the local engagement request
· HQ contract for the respective product/functionality or license use was allocated to the affiliate/local company or local customer.

## 5. DISPUTE RESOLUTION AND ESCALATION PROCESS

*The described process is binding for cross-regional escalations as well as for cases inside one Region.*
If the account teams are unable to reach agreement in a Sales Manager Call, the SVP leaders of the respective franchises shall be asked to reach a resolution.  If the SVP leaders are unable to reach resolution, either the President or VP of Sales Operations shall decide on the appropriate split.

## 6. BUSINESS RULES

**6.1 Parent-Subsidiary Relationship in General**

GAOs must maintain salesforce.com account hierarchy in a way that it reflects the customer's group structure, especially with regards to minority owned organizations and affiliates included in global purchasing contracts. If the GAO has not linked minority owned affiliates that are included under a global contract LAOs can claim up to 80% split for locally led opportunities that are signed under the global agreement. It is the responsibility of the LAO to determine if a parent/subsidiary relationship exists and contact the GAO at the beginning of each sales cycle. If it is determined the LAO has not performed the appropriate due diligence in identifying and contacting the GAO as outlined by the Split Policy, the LAO may forfeit up to 20% of the negotiated Split. LAO activity to determine the parent relationship is not exclusive to salesforce.com but should include reasonable fact finding from internal and external sources (such as customer websites, D&B, DOW Jones, Bloomberg etc.). Split Ruling can be made by the Delegates based on the own reasonableness check.

**6.2 Validity of Parent-Subsidiary Relationships**
A parent- subsidiary relationship is deemed to exist in the following circumstances:
· The entity is wholly or majority owned by another legal entity
· Joint venture (owned 50/50) or minority owned by another legal entity and subject to a Zuora Purchasing contract (listed in there).

**6.3 Pricing** Clear guidance from the GAO for any local pricing/conditions which may compete with the HQ contract must be provided. Locally closed contracts that exceed HQ prices and conditions without GAO approval may result in disciplinary action or penalty up to 100% of the local deal. If the GAO does not deliver pricing/conditions for a local sales cycle the local management may authorize the use of pricing relevant for that transaction. While calculating pricing/conditions the differences due to Price Lists with uplift factors have to be considered.

# Exhibit B



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108

**MAURA HEALEY**
**ATTORNEY GENERAL**

(617) 727-2200
(617) 727-4765 TTY
www.mass.gov/ago

January 10, 2020

Attorney Stephen Riden
Beck, Reed & Ridden, LLP
155 Federal Street, Suite 1302
Boston, MA 02110

RE:     Mr. DeFusco
        Request for Private Right of Action against Zuora, Inc.

Dear Attorney Riden:

Thank you for contacting the Office of the Attorney General's Fair Labor Division.

Massachusetts General Laws Chapter 149, § 150, and Chapter 151, §§ 1B and 20 establish a private right of action for employees who believe they are victims of certain violations of the state wage laws.

This letter is to inform you that we are authorizing you to pursue this matter through a private civil lawsuit. If you elect to sue in civil court, you may bring an action on your own or your clients' behalf, and on behalf of other similarly situated workers.

This office will not pursue an investigation or enforcement at this time.

                        Sincerely,

                        Fair Labor Division
                        Office of Attorney General Maura Healey
                        (617) 727-3465